UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TANYA ROCHELLE ULRICH,<br><br>Defendant. | **4:22-CR-40020-LLP**<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Defendant Tanya Rochelle Ulrich is before the court on an indictment charging her with concealing a person from arrest.  See Docket No. 1. Ms. Ulrich has moved to suppress certain evidence.  See Docket No. 32.  The United States ("government") resists the motion.  See Docket No. 41.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 57.11.

## FACTS

An evidentiary hearing was held on September 22, 2022.  Ms. Ulrich was there in person along with her lawyer, Amanda Kippley, Assistant Federal Public Defender.  The government was represented by its Assistant United States Attorney, Jeff Clapper.  Two witnesses testified and eleven exhibits were

received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

## A.     Ms. Fries' Indictment and First Arrest

A federal arrest warrant was issued for Jaime Jo Fries in May 2021 on an indictment charging her with conspiracy to distribute a controlled substance.  JF Docket No. 1 & 4[1].  DUSM Jack Valentine testified that he was assigned this case shortly after the warrant was issued.  To locate Ms. Fries, DUSM Valentine and his supervisor, SDUSM Gary Bunt, spoke with Ms. Fries' mother, Debra McDaniel, at her home located at ███████████████ ████████████.

DUSM Valentine and SDUSM Bunt testified that Ms. McDaniel agreed to work with them on locating Ms. Fries on the condition that she remain anonymous.  Ms. McDaniel indicated Ms. Fries would be living with her boyfriend, Nick Lamm, somewhere in the Whittier area of Sioux Falls. Ms. McDaniel also told the Marshals that Ms. Fries would be driving a silver Mercedes or BMW, Mr. Lamm would be driving a black Suburban with a Nebraska license plate, and indicated Ms. Fries had a dog.

DUSM Valentine testified that during surveillance of an apartment at ████ ██████████████████████████, officers spotted a woman walking a black lab around the property.   DUSM Valentine also testified that members of the Dakota Territory Fugitive Task Force ("DTFTF") discovered a silver

---

[1] Documents from Ms. Fries' criminal case, United States v. Brockhouse et al, 4:21-cr-40071-KES (D.S.D.), will be cited using the court's assigned docket number preceded by "JF."

Mercedes bearing South Dakota license plate ███████ parked next to a black

Suburban with a Nebraska license plate.  DUSM Valentine indicated at this

point, officers spoke with the property owner, received confirmation Ms. Fries

lived in the building, and eventually arrested Ms. Fries and Mr. Lamm.

DUSM Valentine stated that Ms. McDaniel's information proved to be reliable.

**B.    Ms. Fries' Report of Apparent Violation and Second Arrest**

A federal arrest warrant was issued for Ms. Fries on August 13, 2021, in

connection with an *ex parte* motion for revocation of pre-trial release.  JF

Docket Nos. 47 & 48.  Again, DUSM Valentine was assigned to this case.

DUSM Valentine and SDUSM Bunt were provided a personal data sheet for

Ms. Fries by the United States Probation Office which indicated Ms. Fries' last

known address was ██████████████████████.  See

Docket No. 45, p. 5.  DUSM Valentine and SDUSM Bunt testified that due to

their previous involvement in locating Ms. Fries, they knew that address to

belong to Ms. Fries' mother, Ms. McDaniel.

On August 18, 2021, DUSM Valentine and SDUSM Bunt went to

Ms. Fries' last known address and discovered Ms. Fries was no longer residing

with Ms. McDaniel, although her children lived there.  DUSM Valentine and

SDUSM Bunt testified that they asked Ms. McDaniel to again help locate

Ms. Fries, as she proved to be reliable previously, and Ms. McDaniel agreed.

Ms. McDaniel informed the Marshals that Ms. Fries was living with someone

named "Tanya" in an apartment near █████████████████

██.  From their experience, DUSM Valentine and SDUSM Bunt indicated

they knew this to be the apartment complex located at ███████████

███████████.  Ms. McDaniel explained that to get to the right apartment in

the complex, officers would need to go downstairs, and it would be the first

door on the right.  Ms. McDaniel further expressed that Ms. Fries may have

been working as a food delivery service driver.

The same day, DUSM Valentine and DTFTF travelled to the Dakota

Avenue apartment and spotted a silver Mercedes bearing South Dakota license

plate ██████ parked in the complex lot.  DUSM Valentine testified that by

following the directions provided by Ms. McDaniel (downstairs and first door on

the right), officers approached ███████████  DUSM Valentine testified that an

individual named "Tanya"[2] answered the door.  DUSM Valentine testified that

"Tanya" told them Ms. Fries was not living in the apartment and denied the

officer's consent to enter the unit.  But, during their conversation,

DUSM Valentine testified that he could see a black dog walking throughout the

apartment that looked like the one he saw with Ms. Fries in May 2021.

DUSM Valentine and DTFTF then left the property.

DUSM Valentine testified that after their initial visit, he reached out to

Ms. McDaniel again.  Ms. McDaniel indicated that she did not know where else

Ms. Fries would be staying.  DUSM Valentine testified that when he indicated

to Ms. McDaniel that he spotted a black dog, Ms. McDaniel stated he was at

---

[2] This individual would later be identified as the defendant, Tanya Rochelle
Ulrich.

the right apartment and that Ms. Fries would be wherever the black dog and its new puppies were.

DUSM Valentine testified that on August 23, 2021, he reviewed text messages between Ms. Fries and her boyfriend, Nick Lamm. DUSM Valentine indicated that these text messages discussed Ms. Ulrich on multiple occasions. For example, Ms. Fries texted an apology to Mr. Lamm that her phone had died because "Tanya had her lower cut off when I was there charging it." DUSM Valentine believed Ms. Fries meant to say "power" instead of "lower." Another text from Mr. Lamm asked Ms. Fries why she was spending so much time at Tanya's apartment when she never liked her in the past.

With this additional evidence, DUSM Valentine, SDUSM Bunt, and members of the DTFTF returned to ████████ at ████████████ at around 9:00 am on August 24, 2021. DUSM Valentine and SDUSM Bunt both testified that they went to Ms. Ulrich's apartment early in the morning to ensure Ms. Fries would be present and not working as a driver during a lunch or dinner rush. Upon approaching the apartment complex, DUSM Valentine and SDUSM Bunt indicated they spotted the same silver Mercedes bearing license plate ████████ known to be owned by Ms. Fries.

Initially, DUSM Valentine approached Ms. Ulrich's apartment while SDUSM Bunt remained outside the complex to watch the perimeter. After knocking, DUSM Valentine testified that Tanya answered the door again and he also saw the black dog as well as some puppies inside the apartment. After

being denied consent to enter, DUSM Valentine requested SDUSM Bunt to come in and assist.

SDUSM Bunt testified that he was able to locate ████████████ by following the directions provided to him by Ms. McDaniel.  Once he arrived at the apartment, SDUSM Bunt stated he was able to see a black dog walking around behind Ms. Ulrich, but he did not see any puppies.  SDUSM Bunt testified that he thought "it was reasonable to believe" Ms. Fries was inside Ms. Ulrich's apartment.  SDUSM Bunt indicated this belief was based on his knowledge that Ms. Fries was likely not at work early in the morning, the fact that he spotted both the vehicle and dog known to be owned by Ms. Fries, and Ms. McDaniel's correct description and location of Ms. Ulrich's apartment.

SDUSM Bunt then gave the order for DUSM Valentine and members of DTFTF to enter Ms. Ulrich's apartment.  Ms. Ulrich unsuccessfully tried to block the officers' entry into the apartment.  Upon entering, Ms. Fries was located in the back bedroom of Ms. Ulrich's apartment.  Ms. Fries was then arrested and taken into custody for questioning.

## C.    Statements by Ms. Fries and Ms. Ulrich

DUSM Valentine and ICE-TFO Jason Von Haden conducted an interview of Ms. Fries on August 24, 2021, at approximately 1:00 pm.  See Exhibit H.[3] This interview was conducted at the Federal Courthouse in Sioux Falls, South Dakota.  At the start of the interview, DUSM Valentine administered Miranda[4]

_____

[3] This interview was only audio recorded.

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

warnings to Ms. Fries. Exhibit H, 01:30. Ms. Fries indicated she understood her rights and agreed to waive them. Id. at 02:10. Ms. Fries indicated that she really wasn't staying at Ms. Ulrich's apartment but was just keeping her stuff there. Id. at 02:58. Ms. Fries stated she arrived at Ms. Ulrich's apartment the previous evening, or August 23, 2021. Id. at 04:09. Ms. Fries stated she was given a key to the apartment by Ms. Ulrich several weeks prior. Id. at 04:38. Ms. Fries then invoked her right to counsel and the interview concluded. Id. at 06:17.

On December 7, 2021, Ms. Fries was again interviewed by DUSM Valentine. During this interview, Ms. Fries indicated that she moved into Ms. Ulrich's apartment on August 1, 2021, was present at the apartment during the Marshals' first visit on August 18, and Ms. Ulrich told her that law enforcement was looking for her.

A federal arrest warrant was issued for Tanya Rochelle Ulrich March 1, 2022, on an indictment charging her with concealing a person from arrest. See Docket No. 1. Ms. Ulrich was arrested on March 3, 2022. Later that day, Ms. Ulrich was interviewed by DUSM Valentine and SA David Hohn at the Federal Courthouse in Sioux Falls. See Exhibit I.[5]

At the start of the interview, SA Hohn administered Miranda warnings to Ms. Ulrich. Id. at 12:04. Ms. Ulrich then signed a form indicating that she understood her rights. Id. at 12:51. The purpose of the interview was to determine the extent of Ms. Fries' presence at Ms. Ulrich's apartment in

---

[5] This interview was audio and video recorded.

August 2021. At first, Ms. Ulrich denied that Ms. Fries lived at the apartment and denied that Ms. Fries was at the apartment during the Marshals' first visit on August 18. Id. at 17:28. Ms. Ulrich also denied knowing Ms. Fries was at her apartment on August 24. Id. at 18:00. Ms. Ulrich then denied giving Ms. Fries a key to her apartment. Id. at 21:51.

DUSM Valentine stated to Ms. Ulrich that he knew Ms. Fries was at her apartment during the first visit, second visit, and in between. Id. at 43:37. DUSM Valentine and SA Hohn stated that they had witnesses that could place Ms. Fries at Ms. Ulrich's apartment during this time period. Id. at 45:13. Eventually, Ms. Ulrich admitted that she knew Ms. Fries was at her apartment and that the only reason she let her stay was because Ms. Fries threatened her child. Id. at 48:30.

On March 28, 2022, Ms. Fries was interviewed a third time after her sentencing hearing. During this interview, Ms. Fries indicated that she did not have an official agreement with Ms. Ulrich to live at her apartment, but stated she would help take care of Ms. Ulrich's child and pay rent. Ms. Fries also denied threatening Ms. Ulrich.[6]

Ms. Ulrich now moves to suppress the evidence of Ms. Fries being found in her apartment and the statements made by her and Ms. Fries under the Fourth Amendment. See Docket No. 32. Ms. Ulrich asserts that with only an arrest warrant for Ms. Fries, it was unlawful for law enforcement to enter her

---

[6] These interviews were not recorded. However, at the suppression hearing, the government proffered the facts surrounding the interviews and Ms. Ulrich did not object.

apartment because there were no exigent circumstances, no consent, and no search warrant.  Docket No. 33, p. 4.  Ms. Ulrich also argues the statements made by Ms. Ulrich and Ms. Fries after the illegal search should be suppressed as "fruit of the poisonous tree."  Docket No. 33, p. 5.

## DISCUSSION

### A.    Whether Law Enforcement Had the Authority to Search Ms. Ulrich's House

Ms. Ulrich argues that because there were no exigent circumstances, no consent, and no search warrant, law enforcement's entry and search was unlawful.  Docket No. 33, p. 5.  "The Fourth Amendment provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' " Lange v. California, ___ U.S. ___, 141 S.Ct. 2011, 2017 (2021); U.S. Const. amend. IV. "The ultimate touchstone of the Fourth Amendment is 'reasonableness.' " Id. (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." United States v. Bennett, 972 F.3d 966, 971 (8th Cir. 2020) (quoting United States v. Glover, 746 F.3d 369, 373 (8th Cir. 2014)); see also Payton v. New York, 445 U.S. 573, 603 (1980).  "If officers wish to execute an arrest warrant not at the person's home, but at a different person's home . . . [o]fficers must either obtain a search warrant for the other person's home or have exigent circumstances or consent to enter."

Glover, 746 F.3d at 373 (citing Steagald v. United States, 451 U.S. 204, 2015-26 (1981)).

But this "does not prevent police entry if the arresting officers executing the arrest warrant at the third person's home have a *reasonable belief* that the suspect resides at the place to be entered and have reason to believe that the suspect is present at the time the warrant is executed." United States v. Collins, 699 F.3d 1039, 1041-42 (8th Cir. 2012) (quoting United States v. Powell, 379 F.3d 520, 523 (8th Cir. 2004)) (emphasis added); Bennett, 972 F.3d at 971. "Whether the officers had reasonable belief is based upon the 'totality of the circumstances' known to the officers prior to entry." Glover, 746 F.3d at 373 (citing United States v. Junkman, 160 F.3d 1191, 1193 (8th Cir. 1998)). "The officers' assessment need not in fact be correct; rather, they need only reasonabl[e] belie[f]." Powell, 379 F.3d at 523 (internal citations omitted).

While there may not have been exigency, consent, or a search warrant, the court finds that law enforcement had a "reasonable belief" Ms. Fries was both residing at Ms. Ulrich's apartment and present at the time the arrest warrant was executed based on the information provided by Ms. Fries' mother, Ms. McDaniel. Bennett, 972 F.3d at 971. "[I]f information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." Glover, 746 F.3d at 373 (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)).

Before Ms. Fries' arrest on August 24, 2021, Ms. McDaniel proved to be a reliable source of information on locating Ms. Fries.  After a federal arrest warrant on a new indictment was issued for Ms. Fries in May 2021, DUSM Valentine and SDUSM Bunt spoke with Ms. McDaniel.  Docket No. 45, p. 11.  Ms. McDaniel stated Ms. Fries would be with her boyfriend, Nick Lamm, would be driving a silver Mercedes or BMW, Mr. Lamm would be driving a black Suburban with Nebraska license plates, and Ms. Fries had a dog.  Id.

DUSM Valentine testified that during surveillance, members of DTFTF spotted a woman walking a black lab outside an apartment at ███████████ ███████████████ and discovered a silver Mercedes bearing South Dakota license plate ███████ parked next to a black Suburban bearing a Nebraska license plate in the parking lot of the building.  Ms. Fries was eventually located and arrested at this ███████████ apartment building.  These findings by the DUSM Valentine and DTFTF independently corroborated Ms. McDaniel's information.

Given Ms. McDaniel's prior reliable information and the new information she provided on the whereabouts of Ms. Fries, DUSM Valentine and SDUSM Bunt had "reasonable belief" that Ms. Fries resided at Ms. Ulrich's apartment and was present at the apartment on the morning of August 24, 2021.  First, Ms. Fries was not at her last known location according to the U.S. Probation Office, ██████████████, as that was Ms. McDaniel's residence and Ms. Fries had moved out.  Second, when DUSM Valentine followed the instructions given by Ms. McDaniel on how to locate the apartment Ms. Fries

was staying at (go downstairs in the complex and it will be the first door on the right) an individual named "Tanya" answered the door. Ms. McDaniel believed Ms. Fries was living with someone named "Tanya." The court notes that Ms. McDaniel was the primary caregiver to Ms. Fries' children and the children were living with Ms. McDaniel full-time. Thus, Ms. McDaniel was no ordinary anonymous "tipster." Her relationship to Ms. Fries coupled with her primary role in caring for Ms. Fries' children made her privy to information about Ms. Fries' location, lending another layer of reliability to the information she gave law enforcement.

Third, both times officers visited Ms. Ulrich's apartment, the same silver Mercedes bearing license plate ███████ known to be owned by Ms. Fries was parked in the complex lot. Fourth, knowing Ms. Fries may have been a food delivery service driver, DUSM Valentine and SDUSM Bunt both testified that they went to Ms. Ulrich's apartment early in the morning to ensure Ms. Fries would be present and not working during a lunch or dinner rush. Fifth, DUSM Valentine observed a black dog in Ms. Ulrich's apartment on August 18 and August 24, observed puppies in Ms. Ulrich's apartment on August 24, and SDUSM Bunt observed the black dog on August 24. Again, Ms. McDaniel conveyed Ms. Fries would be wherever the dog and puppies were. Finally, DUSM Valentine's review of Ms. Fries' text messages with Mr. Lamm revealed that Ms. Fries was spending a large amount of time with an individual named "Tanya."

With this evidence, it is clear to the court that DUSM Valentine and SDUSM Bunt were able to *again* corroborate Ms. McDaniel's information and reasonably believed that Ms. Fries was residing and currently present at Ms. Ulrich's apartment on the morning of August 24. Because the court has found that "officers had reasonable belief [] based upon the 'totality of the circumstances' known to the officers prior to entry," there was no Fourth Amendment violation. Glover, 746 F.3d at 373.

Ms. Ulrich rejects this conclusion, stating DUSM Valentine and SDUSM Bunt lacked sufficient reasonable belief that Ms. Fries was residing at Ms. Ulrich's apartment because: (1) the information they received between the August 18 visit and the August 24 visit changed nothing, (2) there was no allegation in the U.S. Probation Office's report of apparent violation that Ms. Fries had changed her address, and (3) SDUSM Bunt did not have sufficient information to give the order to enter Ms. Ulrich's apartment on August 24. The court does not find these arguments persuasive.

First, between the August 18 and August 24 visit, DUSM Valentine reached out to Ms. McDaniel again, who indicated that she "[didn't] know where else [Ms. Fries] would be." Docket No. 45, p. 12. Ms. McDaniel also informed DUSM Valentine to look out for a litter of puppies. Id. During this period, DUSM Valentine also reviewed text messages between Ms. Fries and her boyfriend, Mr. Lamm, which repeatedly mentioned Ms. Ulrich. The texts were sent on June 9, June 21, and July 17, 2021. This additional information obtained by DUSM Valentine solidified officers' reasonable belief that Ms. Fries

13

was residing at Ms. Ulrich's apartment, especially with the discovery of the puppies during the second visit on August 24.

Next, Ms. Ulrich is correct in that there was no allegation that Ms. Fries changed her address in the Probation office's report of apparent violation of pretrial release conditions.  See Docket No. 45, pp. 1-2.  But this alone is not dispositive.  When DUSM Valentine and SDUSM Bunt went to Ms. Fries' last known address according to the Probation office, they discovered it to be Ms. McDaniel's residence and Ms. Fries was no longer residing there.  With this and the information provided by Ms. McDaniel, officers formed a reasonable belief that Ms. Fries was residing elsewhere at Ms. Ulrich's apartment.

Finally, Ms. Ulrich attempts to argue that SDUSM Bunt did not have sufficient information himself to order the entry into Ms. Ulrich's apartment on August 24, as many of the indicia of reasonable belief were observed by DUSM Valentine.  SDUSM Bunt testified that he accompanied DUSM Valentine during his initial conversation with Ms. McDaniel in May 2021, where he was told about Ms. Fries' vehicle, Ms. Fries' dog, and that she would be living with her boyfriend who drove a black Suburban with a Nebraska license plate.

SDUSM Bunt also testified that he again accompanied DUSM Valentine to speak with Ms. McDaniel after Ms. Fries' pretrial release arrest warrant was issued and was told about where Ms. Fries may have been living, Ms. Fries' vehicle, Ms. Fries' black dog, and Ms. Fries' potential occupation as a food delivery service driver.  SDUSM Bunt also testified that he was aware of

DUSM Valentine's efforts to find Ms. Fries at Ms. Ulrich's apartment on August 18.

SDUSM Bunt testified that on August 24, he started outside to watch the perimeter and observed Ms. Fries' silver Mercedes. When he was called inside by DUSM Valentine, he knew how to get to the specific apartment based on the directions given to him by Ms. McDaniel (downstairs and the first door on the right) and observed a black dog in Ms. Ulrich's apartment. Based on his own observations and the communicated observations of DUSM Valentine, SDUSM Bunt had sufficient "reasonable belief [] based upon the totality of the circumstances known to the officers prior to entry." Glover, 746 F.3d at 373.

Thus, because the officers executing Ms. Fries' arrest warrant at Ms. Ulrich's home had a reasonable belief that Ms. Fries resided and was currently present at Ms. Ulrich's apartment at the time the warrant was executed, Ms. Ulrich's Fourth Amendment rights were not violated. Collins, 699 F.3d at 1041-42.

A final argument offered by Ms. Ulrich is something of a red herring. She points out that two of the texts between Ms. Fries and Mr. Lamm were dated prior to June 23, 2021. At the hearing, Ms. Ulrich introduced into evidence the lease for ████████ in which Ms. Ulrich lived and Ms. Fries was found. See Exhibit G. The beginning of the lease was June 23, 2021, *after* the date of the two texts in June. Thus, Ms. Ulrich attempts to argue that even if the texts showed Ms. Fries was living with Ms. Ulrich in June, she was not necessarily living with Ms. Ulrich in August after Ms. Ulrich moved.

15

But the lease agreement actually supports the court's findings that the officers had a reasonable belief that Ms. Fries was residing at Ms. Ulrich's apartment.  Ms. Fries texted Mr. Lamm on June 21 apologizing that her phone had been dead because Tanya had had her "[p]ower cut off" while Ms. Fries was at Tanya's place.  It would not have been possible for Ms. Ulrich to have her power cut off at ███████████ because the lease for that apartment provided that the landlord would pay all utilities.  See Exhibit G at p. 2, Docket No. 45 at p. 15.  The court assumes, without so holding, that Ms. Fries lived with Ms. Ulrich in both apartments, the one she was living in in June when her power was cut off and the one she moved to thereafter, ███████████  The July 17, 2021, text between Lamm and Fries—after Ms. Ulrich entered into the new lease--further supports this conclusion.

But a conclusion to this end is unnecessary.  The officers did not have Exhibit G.  With or without that document, the court holds the Marshals had a reasonable belief that Ms. Fries was residing in ███████████

## B.    Whether the Statements Made by Ms. Ulrich and Ms. Fries Should be Suppressed

Ms. Ulrich asserts that all statements made by her and Ms. Fries after the search of her home should be suppressed.  Docket No. 30, p. 5.  The government rejects this, arguing that Ms. Fries' statements "should not be suppressed because they came from a source independent of any illegality."  Docket No. 41, pp. 10-12.

The exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation."

Davis v. United States, 564 U.S. 229, 231 (2011). "[T]he exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." Hamilton v. Nix, 809 F.2d 463, 465 (8th Cir. 1987) (citing Wong Sun v. United States, 371 U.S. 471, 484-85 (1963)). This includes "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest." Wong Sun, 371 U.S. at 485.

But there are several exceptions to the exclusionary rule. "First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." Utah v. Strieff, 579 U.S. 232, 238 (2016) (citing Murray v. United States, 487 U.S. 533, 537 (1988)). The underlying principle of this doctrine is that "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." United States v. Baez, 983 F.3d 1029, 1037 (8th Cir. 2020) (quoting Murray, 487 U.S. at 542).

Another exception to the exclusionary rule is the attenuation doctrine. Strieff, 579 U.S. at 238. Under this doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' " Id. (quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). The court must consider three factors

17

in determining whether the attenuation doctrine applies: (1) "the temporal proximity between the unconstitutional conduct and the discovery of evidence," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." Id. at 239 (quoting Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

Because this court found that Ms. Ulrich's Fourth Amendment rights were not violated by the search of her apartment, the exclusionary rule does not apply to either her or Ms. Fries' statements. There was no constitutional violation so these statements are not "fruit of the poisonous tree" and should not be suppressed.

Even if this court were to find that there was a Fourth Amendment violation, the attenuation doctrine would apply to the statements made by Ms. Ulrich and Ms. Fries. There are four interviews at issue—Ms. Fries' first interview after her arrest on August 24, 2021, Ms. Fries' follow-up interviews in December 2021 and March 2022, and Ms. Ulrich's interview after her arrest in March 2022. Docket No. 33, pp. 6-7. Ms. Ulrich argues that the statements made at each of these interviews "derive immediately from the unlawful search of Ms. Ulrich's apartment," and should be suppressed. The court disagrees.

First, the temporal proximity between the alleged unlawful entry and the statements made by Ms. Ulrich and Ms. Fries weighs against suppression. Ms. Fries' interview on August 24 occurred approximately four hours after the alleged constitutional violation and the other interviews in question occurred several months later. The Supreme Court and Eighth Circuit have made clear

that for the temporal proximity factor to favor suppression, the statements need to occur shortly after the alleged constitutional violation.  See Strieff, 579 U.S. at 239-240 ("found that the confession should be suppressed, relying in part on the less than two hours that separated the unconstitutional arrest and the confession.") (quoting Brown, 422 U.S. at 604); United States v. Riesselman, 646 F.3d 1072, 1081 (8th Cir. 2011) (because Miranda advisements were given with other intervening circumstances, the defendant's statements given fifteen to twenty minutes after the illegal search did not weigh against attenuation); United States v. Lakoskey, 462 F.3d 965, 975 (8th Cir. 2006) ("such consent did not right the officers' constitutional wrong because [the defendant's] acquiescence came immediately on the heels of the illegal entry.").

For example, in Wong Sun, defendant Toy's statements given to police in his bedroom after police unlawfully entered his residence were suppressed as fruit of the poisonous tree because the statements were taken in the same place and immediately upon the heels of the Fourth Amendment violation. Wong Sun, 371 U.S. at 484-85.  However, Wong Sun's statements, which were taken after Wong Sun's unlawful arrest (also a Fourth Amendment violation) were not suppressed because the statement was taken a few days after Wong Sun's illegal arrest, in a different location, and after he was advised of his right to withhold information.  Id. at 476, 491.  The Court held that the circumstances surrounding Wong Sun's statement rendered the taint of the Fourth Amendment violation "so attenuated as to dissipate the taint."  Id.

Similarly, in United States v. Brooks, the Eighth Circuit determined that there was a "sufficient passage of time" to attenuate the defendant's statements when investigators questioned the defendant around two hours after the initial allegedly unlawful seizure and arrest.  United States v. Brooks, 22 F.4th 773, 780 (8th Cir. 2022).  The court held that after two hours, the investigator's questioning "did not come hard on the heels of an unlawful arrest, but rather after a period of time that allowed for pause and reflection."  Id.  The same is true here.  Based on the approximate four-hour gap between the apartment entry and the August 24 interview of Ms. Fries and the several-month gap with the remaining interviews of the two women, any taint from the alleged Fourth Amendment violation was sufficiently purged.  Wong Sun, 371 U.S. at 491.

There were several other intervening circumstances that weigh against suppression.  The interviews took place at a different location than the alleged Fourth Amendment violation.  See United States v. Vega-Rico, 417 F.3d 976, 980 (8th Cir. 2005) (the fact the interview was conducted in a different location was significant); Riesselman, 646 F.3d at 1080 (the interview's "change of location" was an intervening circumstance.).  Officers also administered Miranda warnings and obtained waivers of those warnings from both Ms. Ulrich and Ms. Fries.  See Exhibit H, Exhibit I, Testimony of DUSM Valentine.  "Providing Miranda warnings is an 'important, although not dispositive,' factor that weighs against suppression."  United States v. Yorgensen, 845 F.3d 908, 914 (8th Cir. 2017).  These intervening circumstances "tend to show [Ms. Ulrich and Ms. Fries] understood [their]

20

choice to speak with the officers was voluntary." <u>Riesselman</u>, 646 F.3d at 1081.

As to "the purpose and flagrancy of the official misconduct," Ms. Ulrich has provided no evidence showing that the entry into her apartment was a purposeful violation or conducted in bad faith. "For the violation to be flagrant, more severe police misconduct is required than the mere absence of prior cause for the seizure." <u>United States v. Lowry</u>, 935 F.3d 638, 643 (8th Cir. 2019) (quoting <u>Strieff</u>, 579 U.S. at 243). Flagrant conduct is demonstrated when: "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." <u>United States v. Simpson</u>, 439 F.3d 490, 496 (8th Cir. 2006) (quoting <u>Brown</u>, 422 U.S. at 605). Quite the opposite, here, officers had "reasonable belief" Ms. Fries was residing and currently present in Ms. Ulrich's apartment on the morning of August 24. Merely arguing that officers did not have proper cause to enter Ms. Ulrich's apartment is insufficient.

Therefore, because of the large temporal gaps between the alleged constitutional violation and the statements made by Ms. Ulrich and Ms. Fries, the presence of intervening circumstances, and the lack of any flagrant officer misconduct, the court finds that the attenuation doctrine applies, and the statements made should not be suppressed.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends DENYING Ms. Ulrich's motion to suppress [Docket No. 32] in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific to require *de novo* review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 5th day of October, 2022.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge