UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>TANYA ROCHELLE ULRICH,<br><br>      Defendant. | 4:22-CR-40020-KES<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED AND DENYING ULRICH'S MOTION TO SUPPRESS |

  The Government charged defendant, Tanya Rochelle Ulrich, with one count of Concealing Person from Arrest in violation of 18 U.S.C. § 1071. Docket 1. Citing the Fourth Amendment, Ulrich moves to suppress all evidence that law enforcement officers recovered during their search of her home on August 24, 2021, including that James Jo Fries was present in the back bedroom of the residence. Docket 32 at 1. Ulrich also moves to suppress all statements that she and Fries made to officers after the search as fruit of an illegal search. *See id.*

  The court referred Ulrich's motion to Magistrate Judge Veronica L. Duffy under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended Ulrich's motion to suppress be denied. Docket 47. Ulrich filed objections to the Report and Recommendation. Docket 49. After a de novo review of the Report and Recommendation and a review of the record, the court adopts the Report and Recommendation as modified below and denies Ulrich's motion to suppress.

**LEGAL STANDARD**

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

**FACTS**

After a de novo review of the transcripts of the suppression hearing and the exhibits received into evidence, the court makes the following pertinent factual findings necessary to resolve this dispute:

In May 2021, Jamie Jo Fries had a warrant out for her arrest. *See* Docket 48 at 7. Deputy United States Marshal Jack Valentine attempted to locate Fries. *See id.* In his attempt, Valentine spoke with Debra McDaniel, Fries's mother, at McDaniel's house, 26 East Rampart Place. *See id.* at 6-7. During this interaction, McDaniel told Valentine that Fries was "running around with her boyfriend at the time, Nick Lamb, and that she was going to be living in the

Whittier neighborhood." *Id.* at 8. McDaniel did not provide a specific address but did say that Fries drove either a silver BMW or Mercedes and that Lamb drove an older black Chevy Suburban with Nebraska license plates. *See id.* After speaking with McDaniel, Valentine went to the Whittier neighborhood and found a silver Mercedes parked next to a black Suburban with Nebraska license plates. *See id.* Valentine then took a picture of the silver Mercedes and sent it to McDaniel, who confirmed Valentine found the right vehicle. *See id.*

Valentine then set up a Dakota Territory Fugitive Task Force to see if they could see Fries or Lamb. *See id.* at 8-9. Valentine learned that Fries had previously received a ticket for an animal control violation, in connection with her black lab. *See id.* at 9. Valentine and the Task Force spotted a woman who roughly matched Fries's description walking a black lab next to her vehicle and Lamb's vehicle. *See id.* Valentine then arrested Fries. *See id.* Magistrate Judge Duffy released Fries from custody on certain conditions. *See* J.F. Docket 23.[1]

On August 13, 2021, Magistrate Judge Duffy ordered that a warrant be issued for Fries's arrest for violating one of her conditions of release. J.F. Docket 49. Valentine became aware of the warrant and soon after attempted to locate Fries. Docket 48 at 4-5. Valentine conducted an initial investigation and found 26 East Rampart Place (McDaniel's residence) to be of interest. *See id.* at 5. On August 18, 2021, Valentine went to that address, but did not find Fries. *See id.* at 5-6. Valentine did, however, speak with McDaniel. *See id.* at 6.

---

[1] Fries's criminal case is *United States v. Brockhouse et al.*, 4:21-cr-40071-KES (D.S.D. 2022). The court will follow the Report and Recommendation's approach using the court's assigned docket number preceded by "J.F."

McDaniel told Valentine that Fries did not live at 26 East Rampart Place. *Id.* Instead, McDonald told Valentine that Fries was "staying with someone named Tanya" in an apartment near 14th and Dakota. *See id.* She also gave Valentine directions on which specific apartment Fries was in, stating that "if you go in the front door of the apartment complex, it's downstairs and the first door to your right[.]" *Id.* McDonald also indicated that Fries still drove the same silver Mercedes. *Id.* at 73. At no time did Valentine or any other law enforcement officer contact Fries's probation officer about Fries's location, despite that being a typical step to take. *Id.* at 28, 59.

On August 18, 2021, Valentine drove towards the intersection that McDaniel had flagged for him and found a silver Mercedes with the same license plates as the Mercedes that he had located earlier that year. *See id.* at 10, 72-73. The Mercedes was parked in a parking lot at 634 South Dakota. *See id.* at 10-11. Valentine then "took the advice of Ms. McDaniel," and went through the first door, down the stairs, and knocked on the first door on the right. *See id.* at 11. Defendant Tanya Ulrich answered the door. *Id.* Valentine informed Ulrich that he had an arrest warrant for Jamie Fries, that he was looking for Fries, and that he had reason to believe she was in the apartment. *See id.* at 12.

Ulrich told Valentine that he could not come in. *Id.* at 13. Ulrich yelled at Valentine, and in response to Valentine's warning that she could be charged with a federal felony of harboring a fugitive if Fries was in the apartment, Ulrich said she understood and that she wouldn't do anything to jeopardize her

4

child. *See id.* Because the door was open, Ulrich saw a black lab in the apartment, which was similar to the one that he saw Fries with earlier that year. *See id.* Valentine said that he and his team "backed up" because they "weren't certain that [Fries] was there[.]" *Id.*

The next week, Valentine texted McDaniel indicating that Fries was not at Ulrich's apartment. *See id.* at 14. McDaniel said that she "do[esn't] know where else [Fries] would be." *Id.* McDaniel asked Valentine if he saw any puppies in the apartment. *Id.* McDaniel explained that Fries's black lab had recently had puppies, and that "if the puppies were there, [Fries] was there." *Id.* In addition to talking with McDaniel, Valentine also reviewed some text messages from the Yankton County jail, between Fries and Lamb. *See id.* Fries and Lamb exchanged these messages in June and July of 2021. *See id.* at 15. On June 21, 2021, Fries sent the following message to Lamb:

> Babe, you just now got my phone turned back on. It died, and the hardwired car charger stopped working. Then Tanya had her lower [sic] cut off when I was there charging it.

*Id.* at 16. On July 17, 2021, Lamb texted Fries, "Why you spending so much time over at Tanya's? You never liked her before, and now all a sudden." *Id.*

With the new information about Fries's puppies and the text messages between Fries and Lamb, Valentine returned to Ulrich's apartment on August 24, 2021. *See id.* at 17. Valentine went to Ulrich's apartment in the mid-morning because they had seen that Fries had a job as a delivery driver for a food delivery service such as Grubhub. *See id.* at 18, 55-56. United States Marshal Service Supervisor Gary Bunt also went with Valentine to Ulrich's

5

apartment on August 24. *See id.* at 52-53. At no point did Valentine or Bunt obtain a search warrant to search Ulrich's house. *See id.* at 44. Bunt stayed on the perimeter of the scene to ensure no one could escape from the window. *See id.* at 53.

Upon arriving at Ulrich's apartment on August 24, Valentine saw the same Mercedes that he saw earlier in May and on August 16. *See id.* at 19. Valentine knocked on the door, and Ulrich answered. *See id.* Ulrich again did not consent to Valentine coming into the apartment. *See id.* Valentine spotted a black lab and puppies. *See id.* at 20. Valentine then called Bunt over. *Id.* at 20, 65.

Bunt and Ulrich spoke briefly, and Bunt soon after told Ulrich that he was going to enter the apartment. *See id.* at 20, 56. Ulrich, who was holding a child in her left arm, attempted to close the door. *Id.* at 21, 56. Bunt put his foot in the door to stop it from fully closing. *Id.* at 21. Ulrich raised her voice and was "very animated, very belligerent, [and] very standoffish." *Id.* at 56. She repeatedly yelled, "get out of my apartment, get out of my apartment." *Id.* She attempted to swing her arm at Valentine and strike her knee against Bunt's leg. *See id.* at 22-23, 57.

Eventually, Valentine went inside the house and shouted, "Jamie, this is the U.S. Marshals, get out here." *Id.* at 23. Fries walked out of a bedroom door. *Id.* In the bedroom Fries left, Valentine saw "multiple open duffel bags that contained clothes, multiple cell phones, a bed that was made with bedding, and other household items." Docket 45 at 13. Based on Valentine's

6

observations, it appeared that Fries "was residing in the back bedroom." *Id.*

After arresting Fries, Valentine spoke with Fries later that day on August 24, 2021, as well as another time on December 7, 2021, and on March 28, 2022. *See* Docket 48 at 44-47. Valentine arrested Ulrich in early March of 2022. *Id.* at 48. Valentine also interviewed Ulrich about the August 24, 2021, encounter. *See id.* at 48-49.

## DISCUSSION

Ulrich makes two primary objections to the Report and Recommendation. Docket 49 at 1. First, Ulrich objects to the Report's conclusion that officers lawfully entered Ulrich's apartment. *See id.* Second, Ulrich objects to the admissibility of evidence that Fries was in Ulrich's apartment, along with subsequent statements made by Ulrich and Fries during interviews with Valentine and other law enforcement officers. *See id.*

### I. Entering Ulrich's Apartment

"A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant." *United States v. Risse*, 83 F.3d 212, 215 (8th Cir. 1996) (citing *Payton v. New York*, 445 U.S. 573, 603 (1980)). But without exigent circumstances or consent, an arrest warrant does not authorize an officer to enter a third-person's home to search for the subject of the arrest warrant. *See Steagald v. United States*, 451 U.S. 204, 213-16 (1981). Instead, officers generally need a search warrant to search a third party's home, because without this general requirement, police who have only an arrest warrant of an individual "could

7

search all the homes of that individual's friends and acquaintances." *Id.* at 215.

Sometimes, however, officers are unsure where the subject of an arrest warrant resides. Thus, officers may enter a third party's home so long as they "have a reasonable belief that the suspect resides at the place to be entered and have reason to believe that the suspect is present at the time the warrant is executed." *United States v. Powell*, 379 F.3d 520, 523 (8th Cir. 2004) (emphasis omitted). "Whether the officers had reasonable belief is based upon the 'totality of the circumstances' known to the officers prior to entry." *United States v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014) (citing *United States v. Junkman*, 160 F.3d 1191, 1193 (8th Cir. 1998)).[2]

---

[2] The court notes that at least some evidence in the record suggests that Fries actually resided in Ulrich's apartment. For example, Fries's car was parked in front of Ulrich's apartment on both August 18 and 24. *See* Docket 48 at 10-11, 18-19. Furthermore, Valentine reported that the back bedroom that Fries walked out of on August 24, 2021, had "multiple open duffel bags that contained clothes, multiple cell phones, a bed that was made with bedding, and other household items." *See* Docket 45 at 13. According to Valentine, "[i]t appeared . . . that Fries was residing in the back bedroom." If Fries did indeed reside in Ulrich's apartment, then officers could lawfully enter Ulrich's apartment to arrest Fries so long as they had reason to believe she was present in the apartment, regardless of whether officers reasonably believed she lived there. *See Payton*, 445 U.S. at 603 ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."); *United States v. Davis*, 288 F.3d 359, 362 (8th Cir. 2002) ("Since Davis was living at the trailer property, the warrant for his arrest permitted officers to execute the warrant at that location."); *Washington v. Simpson*, 806 F.2d 192, 196 (8th Cir. 1986) (when subject of arrest warrant is co-resident with third party, officers may enter residence of the third party without search warrant). But the government did not argue Fries actually resided in Ulrich's apartment, and thus the court declines to make this finding.

### A. Did Officers reasonably believe Fries resided in Ulrich's apartment?

The court must first decide whether Valentine and Blunt reasonably believed Fries resided in Ulrich's apartment. Valentine spoke with Fries's mother, McDaniel, multiple times about where Fries may be. Docket 48 at 6-8, 14. In fact, just a few months before August 24, 2021, McDaniel provided accurate information about where officers would find Fries at a separate location. *See id.* at 8. McDaniel accurately named the neighborhood where officers could find Fries. *Id.* McDaniel also told Valentine that Fries drove either a silver Mercedes or BMW and that her boyfriend, Nick Lamb, drove a black suburban Chevy. *See id.* This information was accurate, as Valentine found a silver Mercedes and black Chevy suburban parked in the same neighborhood. *See id.*

Because McDaniel reliably provided information to Valentine about Fries's location in the past, it was reasonable for Valentine to rely on McDaniel's assertions about Fries's location in August of 2021. *See Glover*, 746 F.3d at 373. In *Glover*, police officers received a call from a confidential informant who knew the defendant's name, location, date of birth, and the fact that he had outstanding arrest warrants. *See id.* at 370, 73. The informant knew the entrance gate code. *See id.* at 373. Officers approached the address the informant relayed to them and observed that a vehicle in the driveway matched the description of one of the vehicles associated with the defendant in the defendant's fugitive profile. *See id.* at 373-74. Officers called the informant

back, who then relayed additional information about what the defendant was doing in real time. *See id.* at 374. The Eighth Circuit found that the totality of these circumstances supported the officers' reasonable belief that the defendant resided and was present at the home at the time officers searched the home. *See id.*

Valentine's reliance on McDaniel is similar to the officers' reliance on the confidential informant in *Glover*. Just as the confidential informant told officers about the entrance gate code, so too did McDaniel tell Valentine specific directions about how to find the exact apartment in which Fries was located. *See id.* at 373; Docket 48 at 6 (noting that McDaniel told Valentine that if he "go[es] in the front door of the apartment complex, it's downstairs and the first door to your right[.]"). The specific instructions from McDaniel suggest "she had a close relationship with [Fries] or the property." *Glover*, 746 F.3d at 373. McDaniel also told officers that Fries was staying with someone named Tanya, and Valentine soon confirmed that Tonya did in fact live at the apartment where McDaniel directed them. *See* Docket 48 at 11-12. Additionally, in between August 18 and 24, McDaniel asked Valentine if there were any puppies in the house. *Id.* at 14. McDaniel explained that Fries's black lab had recently had puppies, and that "if the puppies were there, [Fries] was there." *Id.* And on August 24, Valentine spotted puppies in Ulrich's apartment, which further bolsters McDaniel's credibility and in turn Valentine's reasonable belief that Fries resided and was present in Ulrich's apartment. *See id.* at 20. In summary, officers reasonably relied on McDaniel for information. In fact,

10

Valentine arguably had more reason to trust the information from McDaniel than the officers in *Glover*. Unlike in *Glover*, which involved an anonymous person, McDaniel was Fries's mother. *See id.* at 373; Docket 48 at 6.

But Valentine did not just rely on his conversations with McDaniel. On both August 18 and 24, Valentine observed Fries's silver Mercedes—the same one Valentine associated with Fries a few months earlier in May—parked outside of Ulrich's apartment complex. *See* Docket 48 at 10-11, 18-19. Valentine also read text messages from June and July of that year that suggested that Fries spent a significant amount of time with Ulrich. *See id.* at 16-17. Of course, as Ulrich stresses, these text messages alone would not supply a reasonable belief that Fries resided in Ulrich's apartment. *See* Docket 49 at 6. But they nonetheless comport with and reinforce the other information officers knew suggesting that Fries lived in Ulrich's apartment. And finally, Valentine testified that both times he interacted with Ulrich, Ulrich appeared agitated. For example, on August 18, Valentine testified she "yelled" at officers to leave. *See* Docket 48 at 13. On August 24, she raised her voice at the officers almost immediately. *Id.* at 21. Bunt similarly testified that on August 24, Ulrich was "very animated, very belligerent, [and] very standoffish." *Id.* at 56. Valentine further explained that based on his experience, Ulrich's reactions caused suspicion because "generally speaking, people that have nothing to hide don't shout at the cops." *Id.* at 21. All of these factors, along with the information from McDaniel, are sufficient such that an officer could reasonably believe Fries resided in Ulrich's apartment.

11

Ulrich resists this conclusion by making two primary arguments. First, Ulrich argues that "[l]aw enforcement unreasonably declined to speak to Ms. Fries's probation officer to determine where she lived." Docket 49 at 2. In support, she notes that Fries had been in regular contact with her probation officer—indeed, as recent as just a few weeks before August 24—and that Bunt testified that officers "typical[ly] [] contact the probation office to find out information about where [a fugitive] would be living[.]" *See* Docket 48 at 59. Furthermore, Valentine testified that "there was nothing in the [pre-trial] violation report where Probation indicated that there was a problem with where [Fries] was living[.]" *Id.* at 38; *see also* Docket 45 at 1-2. Thus, Ulrich argues that it was unreasonable for officers "to proceed with the assumptions of Ms. Daniel, Ms. Fries's mother, about where Ms. Fries was living, before attempting to verify her address with probation[.]" Docket 49 at 3.

Ulrich's argument implicitly assumes that Ms. Fries had just one home, but the Eighth Circuit has explicitly rejected this assumption. *See Risse*, 83 F.3d at 217. In *Risse*, officers searched for the defendant's girlfriend in order to execute an arrest warrant for the girlfriend and entered the defendant's home to do so without a warrant. *See id.* at 214. In the process, officers observed marijuana, which ultimately lead the government to obtain a search warrant and subsequently seize more marijuana, marijuana paraphernalia, several guns, two scales, and cash. *See id.* Facing drug tracking and firearm charges, the defendant moved to suppress the evidence found in his house. *See id.* He argued that because the officers knew, or should have known, that the

12

girlfriend lived at a different address other than the defendant's address, the officers did not reasonably believe she lived at his house and thus violated his Fourth Amendment rights when they entered without a warrant. *See id.* at 217.

The *Risse* court rejected this argument, stating there is "no authority to support Risse's implicit assumption that a person can have only one residence for Fourth Amendment purposes." *Id.* Rather, a dwelling "can certainly be considered [a person's] 'home' for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if [the person] concurrently maintains a residence elsewhere as well." *Id.* (quoting *Steagald*, 451 U.S. at 230-31 (Rehnquist, J., dissenting)). Here, even if officers could have spoken to probation officers, and even if probation officers had a different address on file for Fries, officers could still reasonably believe that Fries resided with Ulrich. And given the amount of information officers had as discussed above, Valentine and Bunt did in fact reasonably believe Fries was residing with Ulrich. Thus, Ulrich's argument about the officers' failure to discuss Fries's location with probation fails.

Ulrich's second argument also fails. Ulrich asserts that the fact that Valentine "backed up" because he was not "certain that [Ms. Fries] was there" and subsequently texted McDaniel that "[Fries] [was] not at the apartment" suggests that after the August 18 visit, Valentine did not possess enough information to form a reasonable belief that Fries lived in Ulrich's apartment. *See* Docket 49 at 4 (first alteration in original); Docket 48 at 13; Docket 45 at 12. Ulrich argues that because officers did not enter Ulrich's apartment on

13

August 18, 2021, officers acted unreasonably in entering on August 24 given the "few facts that law enforcement learned between the August 18 and August 24 visits to Ms. Ulrich's apartment . . . ." Docket 49 at 4-5.

But Ulrich's argument places undue weight on Valentine's decision not to enter Ulrich's apartment on August 18. Even if Valentine was not certain that Fries was at Ulrich's apartment on August 18, the Fourth Amendment does not require certainty: it merely requires that officers reasonably believed Fries resided in Ulrich's apartment. *Powell*, 379 F.3d at 523. Furthermore, an officer's subjective beliefs about whether they have a reasonable belief is also irrelevant: instead, the court looks to whether an objective officer could reasonably believe Fries resided in Ulrich's apartment. *See Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (finding officers' real motivations for entering a home to be irrelevant because "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " (second alteration in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978))); *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004) (finding no Fourth Amendment violation even when the criminal offense for which there is probable cause to arrest is not "closely related" to the offense stated by the arresting officer at the time of the arrest because "[the Supreme Court's] cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); *Whren v. United States,* 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth

14

Amendment analysis."); *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016) ("As a result, [the officer's] observation of the traffic violation based on his use of the radar gave him probable cause to stop the vehicle, and his subjective intent to detain the vehicle for a dog-sniff search is irrelevant.")

      Here, as of August 18, an officer could have reasonably believed Fries was residing in Ulrich's apartment. On August 18, Valentine had the information that McDaniel told him, including how to find the specific apartment where Fries stayed. McDonald had previously given reliable information to Valentine about Fries's location just a few months earlier. *See* Docket 48 at 6-9. McDonald told Valentine that Fries was "staying with someone named Tanya" in an apartment near 14th and Dakota. *See id.* at 6. McDonald told Valentine about Fries's silver Mercedes, which Valentine saw parked outside the apartment complex. *See id.* at 10, 72-73. And furthermore, Valentine "took the advice of Ms. McDaniel," and went through the first door, down the stairs, and knocked on the first door on the right. *See id.* at 11. Ulrich answered the door, and Valentine noticed a black lab that appeared to be the same dog that Valentine had seen Fries with earlier in May. *Id* at 11-13. In sum, Valentine's observations corroborated much of what McDaniel told Valentine. Together, these factors provided Valentine with sufficient information such that he could reasonably believe, as of August 18, that Fries lived in Ulrich's apartment, given McDaniel's demonstrated track record. Thus, the court rejects Ulrich's argument that Valentine's failure to enter Ulrich's apartment on August 18 suggests Valentine could not reasonably believe Fries

15

lived in Ulrich's apartment on August 24.

### B. Did Officers reasonably believe Fries was in Ulrich's apartment on August 24, 2021 at the time of the search?

Having found that officers reasonably believed Fries resided in Ulrich's apartment, the court next considers whether they reasonably believed they would find Fries in Ulrich's apartment on August 24, 2021. Both Valentine and Bunt testified that they believed Fries worked as a food delivery driver for a delivery service such as Grubhub. *See id.* at 18, 55-56. Valentine explained that he went to Ulrich's apartment in the mid-morning to avoid a lunch or dinner rush. *See id.* at 17-18. Bunt echoed this explanation. *See id.* at 55-56. The court finds this explanation reasonable. *See, e.g.*, *Risse*, 83 F.3d at 217 (citing favorably *United States v. Lauter*, 57 F.3d 212, 215 (2d. Cir. 1995), which found belief that suspect was currently present at dwelling was reasonable because officer knew that suspect was unemployed and typically slept late). Additionally, Valentine saw the silver Mercedes—the same car Valentine confirmed with McDaniel that Fries drove—parked in the parking lot outside of Ulrich's apartment as Valentine walked towards the apartment, further supporting a reasonable belief that Fries was present at the time Valentine entered Ulrich's apartment. *See* Docket 48 at 8, 18-19. Given the totality of the circumstances, the court finds Valentine and Bunt reasonably believed Fries was present at the time they approached and entered Ulrich's apartment.

Because officers reasonably believed that Fries both resided and was present in Ulrich's apartment, they lawfully entered Ulrich's apartment to execute the arrest warrant for Fries. The court overrules Ulrich's first objection.

## II.   Suppression

Ulrich also objects to the Report's findings that the attenuation doctrine applies to Ulrich's and Fries's statements to law enforcement during interviews. Docket 49 at 8. Because the court concludes that officers did not violate Ulrich's Fourth Amendment rights, the court overrules Ulrich's second objection as moot.

## CONCLUSION

Officers lawfully entered Ulrich's apartment on August 24, 2021. Perhaps it would have been better for them to have sought a search warrant of Ulrich's apartment after August 18. But this court is not a policy maker, nor does it have the authority to determine best practices for law enforcement. The court cannot require that officers take the best course of action; only a legal one. And here, officers complied with the Fourth Amendment's commands: they reasonably believed Fries resided in Ulrich's home, and they reasonably believed Fries was present in the home at the time of their search. This conclusion ends the inquiry.

The court adopts Magistrate Judge Duffy's recommendation as modified and denies Ulrich's motion to suppress. Thus, it is

ORDERED that the Report and Recommendation (Docket 47) denying Ulrich's motion to suppress is adopted as modified by this opinion. The motion

to suppress (Docket 32) is denied.

    Dated November 22, 2022.

                                      BY THE COURT:

                                      /s/ *Karen E. Schreier*
                                      KAREN E. SCHREIER
                                      UNITED STATES DISTRICT JUDGE